1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,              No. 1:15-cr-00286-DAD-BAM

12                  Plaintiff,

13        v.                                ORDER DENYING DEFENDANT'S
                                            MOTION TO DISMISS, MOTION TO
14   MAJED BASHIR AKROUSH, et al.,          SUPPRESS, AND MOTION FOR
                                            DISCOVERY
15                  Defendants.
                                            (Doc. No. 332, 338, 366)
16

17

18        This matter is before the court on motions to dismiss, suppress evidence, and for

19   discovery brought on behalf of defendant Majed Bashir Akroush.[1]  (Doc. Nos. 332, 338, 366.)  A

20   hearing on those motions was held on October 29, 2018, at which time the motions were not

21   taken under submission for decision; instead a supplemental briefing schedule with respect to the

22   motions was established at that time.  (Doc. No. 377.)  Eventually, supplemental briefing was

23   submitted and a further hearing on the motions was held on April 15, 2019 at which  Assistant

24   United States Attorney Karen Escobar appeared on behalf of the United States, and attorney Marc

25   ─────────────────────

26   [1]  The motion to dismiss was originally filed by Haitham Eid Habash, a co-defendant in this case.
     (Doc. No. 332.)  Akroush subsequently filed a notice of joinder with respect to that motion.
27   (Doc. No. 340.)  Although defendant Habash thereafter entered into a plea agreement with the
     government and is therefore no longer seeking dismissal, the parties and the court consider the
28   motion to dismiss to be pending due to Akroush's joinder.

                                               1

Days appeared on behalf of defendant.  Having reviewed the parties' briefing and heard from counsel, defendant Akroush's motions will be denied.  However, the court will grant in part Akroush's  request for a bill of particulars.

**DISCUSSION**

## A.     Motion to Dismiss the Indictment

The court first addresses defendant's motion to dismiss.  (Doc. No. 332.)  It should be noted that motion sought dismissal of the original indictment in this case.  (Doc. No. 1.)  However, on February 21, 2019, a superseding indictment was returned which, in certain respects, mooted the arguments raised by the defense in support of dismissal.  (Doc. No. 414.)  The parties accordingly filed further briefing with respect to whether the superseding indictment is also subject to dismissal. (Doc. Nos. 416, 424.)  The court will confine its analysis to the arguments presented in those supplemental briefs.

Defendant Akroush first argues that the superseding indictment must be dismissed because the allegations in counts one and two are unconstitutionally vague with respect to the time frame of the charged conspiracies.  Both of the counts at issue here allege a conspiracy to manufacture, distribute, and to possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841 and 846.  The sufficiency of the allegations of an indictment in this regard was addressed by the Ninth Circuit in *United States v. Forrester*, 616 F.3d 929 (9th Cir. 2010).  The court in *Forrester* explained the requirements as follows:

> Forrester contends that the indictment is insufficient because it fails to specify a beginning date for the conspiracy, thereby possibly subjecting him to double jeopardy. However, although an indictment cannot be completely open-ended, *see United States v. Cecil*, 608 F.2d 1294, 1296–97 (9th Cir. 1979), an indictment that specifies an end date is sufficient to apprise defendants of the charges and enable them to prepare a defense, *see United States v. Rohrer*, 708 F.2d 429, 435 n.7 (9th Cir. 1983) (holding that an indictment alleging that the conspiracy extended until "at least" 1980 was sufficient).
>
> In addition, uncertainty regarding a conspiracy's beginning and ending dates does not render an indictment fatally defective so long as overt acts alleged in the indictment adequately limit the time frame of the conspiracy. *United States v. Laykin*, 886 F.2d 1534, 1542 (9th Cir.1989) (18 specific facts alleged in the indictment were sufficient to limit the time frame). Here, the second

superceding [*sic*] indictment tracks the language of the conspiracy statute, identifies a location and co-conspirators, and alleges the purpose of the conspiracy. It also alleged a semi-discrete time period (it gave an end date but no beginning date) and certain overt acts. Taken together, the indictment was sufficient to apprise Forrester of the charges against him, enable him to prepare a defense, and to avoid double jeopardy on the same charge.

*Forrester*, 616 F.3d at 940–41. Relying on this passage from the decision in *Forrester*, defendant Akroush argues that the superseding indictment in this case is deficient because the conspiracies not only are alleged to have begun "at a time unknown, but not later than on or about" a given date and continued to "on or about" but that the indictment also fails to allege any overt acts in connection with the charged conspiracies. (Doc. No. 424 at 2–3.)

Under *Forrester*, an indictment alleging a conspiracy to violate §§ 841 and 846 will survive a vagueness challenge if it does one of two things. First, the indictment will be sufficient if it "specifies an end date." *Forrester*, 616 F.3d at 941. However, even if the indictment fails to specify such an end date, it will nonetheless be deemed sufficient "so long as overt acts alleged in the indictment adequately limit the time frame of the conspiracy." *Id.* Defendant Akroush's argument that an indictment in charging a conspiracy must *always* allege overt acts in order to pass constitutional scrutiny is therefore contrary to the holding in *Forrester*. While allegations of overt acts may be sufficient to adequately provide notice of the timeframe of the alleged conspiracy, they are not necessary.[2] *See United States v. Aispuro-Medina*, No. CR 16-01137-TUC-JAS (EJM), 2016 WL 11467565, at \*3 (D. Ariz. Oct. 5, 2016), *report and recommendation adopted*, 2016 WL 6136451 (D. Ariz. Oct. 21, 2016); *United States v. Hallock*, No. 2:06-CR-396 JCM LRL, 2014 WL 1053596, at \*6 (D. Nev. Mar. 14, 2014) ("[T]he Ninth Circuit has repeatedly held that indictments specifying an end date to criminal activity without specifying a start date are sufficiently specific."). Here, because the superseding indictment alleges that the

/////

---

[2]  As the government correctly points out, proof of an overt act is not required in order to secure a conviction for violating 21 U.S.C. § 846. *United States v. Shabani*, 513 U.S. 10, 15 (1994); *see also United States v. Ortiz*, No. 15-CR-00594-RS-1, 2016 WL 4239370, at \*4 (N.D. Cal. Aug. 11, 2016) ("[A]s the Government need not prove the commission of any overt acts in furtherance of the conspiracy to convict [defendant] of violating 21 U.S.C. § 846, it need not include overt acts in the indictment.") (internal quotation marks omitted).

conspiracy continued to on or about October 13, 2015, no overt acts need be alleged in order for the indictment to be found sufficient in this regard.

Relatedly, defendant Akroush argues that the superseding indictment is deficient because it alleges that the conspiracies occurred "in the Counties of Kern and Los Angeles, within the State and Eastern and Central Districts of California, *and elsewhere*." (Doc. No. 414 at ¶¶ 13, 15) (emphasis added). He cites the Ninth Circuit's decision in *Cecil* for the proposition that such charging language is impermissible because the phrase "and elsewhere" indicates that the conspiracy could have occurred anywhere. *Cecil*, 608 F.2d at 1297. Without any kind of geographic limitation in the indictment, defendant Akroush argues that "there is no safeguard that Akroush will not be prosecuted 'elsewhere' for the same acts constituting these alleged conspiracies." (Doc. No. 424 at 4.)

While the superseding indictment is relatively brief in its allegations, the court is not persuaded that it must be dismissed under the principles announced in *Cecil*. The indictment in that case suffered from numerous defects: in addition to alleging that the charged conspiracies occurred "in Arizona, Mexico, and elsewhere," the indictment failed to "state any other facts or circumstances pertaining to the conspiracy or any overt acts done in furtherance thereof."[3] *Cecil*, 608 F.2d at 1297. However, the "most important[]" deficiency identified by the Ninth Circuit in *Cecil* was the indictment's failure "to place the conspiracies within any time frame," leaving the conspiracy "open-ended in both directions." *Id.* As already indicated, the superseding indictment

---

[3] As noted, a defendant charged with conspiracy to manufacture, distribute, and to possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841 and 846 need not have committed an overt act in order to be found guilty of the offense. *Shabani*, 513 U.S. at 15 ("What the Ninth Circuit failed to recognize we now make explicit: In order to establish a violation of 21 U.S.C. § 846, the Government need not prove the commission of any overt acts in furtherance of the conspiracy.") At the time the decision in *Cecil* was issued, however, Ninth Circuit law was to the contrary, and required proof of an overt act in furtherance of the conspiracy in order to secure a conviction. *See United States v. Monroe*, 552 F.2d 860, 862–63 (9th Cir. 1977). Thus, the failure of the indictment in *Cecil* to allege any overt act amounted to a failure to allege an essential element of the offense. *See United States v. Tavelman*, 650 F.2d 1133, 1137 (9th Cir. 1981) ("An indictment which tracks the offense in the words of the statute is sufficient if those words fully, directly, and expressly set forth all the elements necessary to constitute the offense intended to be proved."). Because the law on this point has changed, this deficiency identified in *Cecil* is no longer of legal significance.

4

in this case does not suffer from this notable deficiency.  In addition, although the superseding indictment employs the same "and elsewhere" language as in *Cecil*, it provides greater geographic specificity than the indictment in that case, stating that the conspiracy took place in specific judicial districts and counties within California.  *See United States v. Benavides*, No. CR 06-62-M-DWM, 2009 WL 10679281, at *5 (D. Mont. Dec. 15, 2009) (distinguishing *Cecil* and noting that in that case, the indictment alleged that "drugs were stored throughout Western Montana and that drugs were distributed to dealers in Boise, Idaho, as well as Kalispell, Ronan, Missoula, and Ravalli County").  As one district court has concluded, under Ninth Circuit law, an indictment alleging a conspiracy to violate §§ 841 and 846 need only allege four things to be sufficient:  (1) a conspiracy to distribute drugs, (2) the drug involved, (3) the time frame during which the conspiracy was operative, and (4) the statute allegedly violated.  *Aispuro-Medina*, 2016 WL 11467565, at *3.  Counts one and two of the superseding indictment meet each of these requirements.  Defendant Akroush's motion to dismiss will therefore be denied.

As an alternative to dismissal of the superseding indictment, defendant Akroush requests that the government be required to provide a bill of particulars with respects to counts 1 and 2. (Doc. No. 424 at 5.)  Specifically, he seeks a bill of particulars that "(1) delineates which allege [*sic*] seizures or shipments are part of the conspiracies alleged in counts 1 and 2; (2) corrects and limits the time frame in counts 1 and 2; (3) includes only alleged acts which occurred in Kern and Los Angeles counties; and (4) identifies the co-conspirators known to the grand jury.  (*Id.*)

The purpose of a bill of particulars is to inform the defendant of the nature of the charges against him or her with sufficient precision to enable the defendant to prepare for trial, to avoid or minimize the danger of surprise at the time of trial, and to protect against double jeopardy should the defendant be prosecuted a second time for the same offense.  *United States v. Ayers*, 924 F.2d 1468, 1483 (9th Cir. 1991); *United States v. Mitchell*, 744 F.2d 701, 705 (9th Cir. 1984); *United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979).  Federal trial courts have broad discretion in determining whether to grant a motion for bill of particulars.  *See Will v. United States*, 389 U.S. 90, 98 (1967); *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999); *United States v. Calabrese*, 825 F.2d 1342, 1347 (9th Cir. 1987) (abuse of discretion standard on appeal).  In exercising its

discretion, the court should consider the totality of the information available to the defendants through the indictment, affirmations, and pretrial discovery and determine whether, in light of the charges the defendants must answer, the filing of a bill of particulars is warranted. *United States v. Reddy*, 190 F. Supp. 2d 558, 565 (S.D.N.Y. 2002); *United States v. Santiago*, 174 F. Supp. 2d 16, 34 (S.D.N.Y. 2001) (court should also consider the complexity of the offenses charged and the clarity of the indictment).

In striking a proper balance between the legitimate interests of the government and those of the defendant the court must keep in mind that a bill of particulars is not a discovery tool or a device to allow the defense to preview the government's evidence. *United States v. Fletcher*, 74 F.3d 49, 52 (4th Cir. 1996); *United States v. Ramirez*, 54 F. Supp. 2d 25, 29 (D.D.C. 1999); *see also Santiago*, 174 F. Supp. 2d at 34. Nor is a bill of particulars to be used to discover the witnesses the government intends to call at trial. *United States v. DiCesare*, 765 F.2d 890, 897–98 (9th Cir.), *amended on other grounds*, 777 F.2d 543 (1985). "A defendant is not entitled to know all the evidence the government intends to produce, but only the theory of the government's case." *Giese*, 597 F.2d at 1181; *see also United States v. Ryland*, 806 F.2d 941, 942 (9th Cir. 1986); *United States v. Middleton*, 35 F. Supp. 2d 1189, 1192 (N.D. Cal. 1999) ("[T]he goal of a bill of particulars is satisfied if the defendant is aware of the 'theory of the government's case.'"). Moreover, because it confines the government's case to the particulars furnished, a bill of particulars should not be granted insofar as it would unduly restrict the government's ability to present its case. *United States v. Gibson*, 175 F. Supp. 2d 532, 536 (S.D.N.Y. 2001) (citing *United States v. Perez*, 940 F. Supp. 540, 550 (S.D.N.Y. 1996)). Finally, "[t]he decisive inquiry in deciding such a motion is whether the indictment adequately advises 'the defendant of the specific acts of which he is accused.'" *Santiago*, 174 F. Supp. 2d at 34 (quoting *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990)); *see also United States v. Davidoff*, 845 F.2d 1151, 1154–55 (2d Cir. 1988).

The court first addresses defendant Akroush's request that the government delineate which searches or shipments relate to each of the charged conspiracies. In this regard, as a general rule, a defendant may not use a motion for a bill of particulars to obtain a list of overt

6

acts. *See DiCesare*, 765 F.2d at 898 (citing *Cook v. United States*, 354 F.2d 529, 531 (9th Cir. 1965)). Nonetheless, some district courts within the Ninth Circuit have ordered that defendants be apprised of which acts the government intended to prove as part of the charged conspiracy where circumstances made it appropriate to do so. *See United States v. Feil*, No. CR 09-00863 JSW, 2010 WL 1525263, at *3 (N.D. Cal. Apr. 15, 2010) (requiring the government to identify the defendants' overt acts in support of the alleged conspiracies to possess with intent to distribute marijuana in light of the voluminous discovery in that case); *United States v. Chen*, No. C05-375 SI, 2006 WL 3898177, at *3–4 (N.D. Cal. Nov. 9, 2006) (ordering the government to provide defendant with a list of "which specific [marijuana] grow site or sites [defendant] is alleged to have been involved with" due to the scope and complexity of the indictment). The court finds that the conspiracies charged in this case are sufficiently complex and unusual that the granting of a bill of particulars is appropriate. Accordingly, the government will be directed to identify by way of bill of particulars which searches and/or shipments identified in discovery are, according to the government, related to the two conspiracies charged in counts one and two of the superseding indictment.

In light of the granting of a bill of particulars in this regard, the court finds it unnecessary to require any modification of the time frames alleged with respect to counts one and two of the superseding indictment as requested by defendant Akroush. It is also therefore unnecessary to require the government to "include only alleged acts which occurred in Kern and Los Angeles Counties" as sought by the defense (Doc. No. 424 at 5.) Once the defendant is in receipt of the bill of particulars advising which searches and/or shipments are to be relied on by the government in proving the conspiracies charged in counts one and two, he will be on ample notice with respect to both the alleged timing and location of the charged conspiracies. The court concludes that no further disclosure by the government is required in order for defendant Akroush to prepare an adequate defense at trial.

Similarly, the court denies defendant Akroush's fourth bill of particulars request, that the government identify all co-conspirators known to the grand jury. *See DiCesare*, 765 F.2d at 897 (request for names of unindicted coconspirators did not warrant a bill of particulars); *United*

1  *States v. Cadena*, No. CR. S-07-0248 WBS, 2008 WL 2557948, at *2 (E.D. Cal. June 24, 2008);

2  *United States v. Shabazz*, 995 F. Supp. 1109, 1115 (D. Or. 1998).

3      For the reasons set forth above, defendant Akroush's alternative motion for a bill of

4  particulars is granted in part.

5  **B.      Motion to Suppress Evidence Under *Franks***

6      Here, defendant Akroush moves to suppress evidence seized during the execution of

7  warrants 1:15-SW-00289 (SW-289) and 5:15-SW-00066 (SW-66).  (Doc. No. 338.)  Warrant

8  SW-289 authorized the search of defendant Akroush's residence, used car business, and various

9  safe deposit boxes (see Exh. A), while warrant SW-66 authorized the search of his vehicle, a 1962

10  Chevrolet Impala (the "Subject Vehicle") (see Exh. B).   The affiant on the search warrant

11  application for defendant Akroush's residence, used car business, and various safe deposit boxes

12  was DEA Task Force Officer Scott Merritt.  The affiant with respect to the warrant for the search

13  of the defendant's vehicle was DEA Special Agent Ryan Olson.  Defendant Akroush maintains

14  that the affidavits in support of each warrant contained false and misleading statements and

15  omitted material facts and he requests a *Franks* hearing.

16      "A defendant is entitled to an evidentiary hearing if he 'makes a substantial preliminary

17  showing that a false statement knowingly and intentionally, or with reckless disregard for the

18  truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is

19  necessary to the finding of probable cause.'"  *United States v. Craighead*, 539 F.3d 1073, 1080–

20  81 (9th Cir. 2008) (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)); *see also United

21  States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011); *United States v. Bennett*, 219 F.3d 1117, 1124

22  (9th Cir. 2000); *United States v. Johns*, 851 F.2d 1131, 1133 (9th Cir. 1988).  Therefore, in order

23  to be entitled to an evidentiary hearing, a defendant must come forward with specific allegations,

24  allege a deliberate falsehood or reckless disregard for the truth, and support that claim with a

25  sufficient offer of proof.  *Craighead*, 539 F.3d at 1080 (citing *United States v. Kiser*, 716 F.2d

26  1268, 1271 (9th Cir. 1983)).  Where a substantial preliminary showing is made, "the court must

27  hold a hearing to determine if any false statements deliberately or recklessly included in the

28  /////

affidavit were material to the magistrate's finding of probable cause."[4]  *Johns*, 851 F.2d at 1133 (quoting *United States v. Burnes*, 816 F.2d 1354, 1357 (9th Cir. 1987)); *see also United States v. Stanert*, 762 F.2d 775, 780 (9th Cir.), *as amended*, 769 F.2d 1410 (9th Cir. 1985).  To prevail on a *Franks* challenge to the veracity of the affidavit and the validity of the warrant, the defendant must ultimately establish by a preponderance of the evidence:  (1) that the affiant officer intentionally or recklessly made false or misleading statements or omissions in support of the warrant; and (2) that the false or misleading statement or omission was material, that is, it was necessary to the finding of probable cause.  *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017) (citing *United States v. Martinez-Garcia*, 397 F.3d 1205, 1214–15 (9th Cir. 2005)).  If the defendant satisfies both requirements, "the search warrant must be voided and the fruits of the search excluded."  *Id.* (quoting *Franks*, 438 U.S. at 156).

According to the affidavits in support of both search warrants, defendant Akroush established the website www.magicmanswholesale.com (Magic Man's) in January of 2011 and sold smokable synthetic cannabinoids (SSCs) through that website.  (Exh. A-1 at ¶ 57; Exh. B-1 at ¶ 15.)  Akroush listed 4030 Niles Street, Bakersfield, CA as the physical address associated with the website.  (Exh. A-1 at ¶ 57.)  On November 9, 2012, Investigator Ray Mock of the Dothan Police Department (DPD) in Alabama was dispatched to a United Parcel Service location and learned of a damaged box containing SSC products.  (*Id.* at ¶ 61.)  Inside the box, Mock located two invoices, which indicated that the box was shipped from Magic Man's to Bimal Patel.  (*Id.* at ¶ 63.)  According to the packing list, the contents of the box included 500 packages of "Diablo 36," 300 packages of "Super Nova," 100 packages of "Mr. Happy," 300 packages of "Scooby Snax Strawberry," and 700 packages of "Scooby Snax."  (*Id.* at ¶ 61.)

On December 10, 2012, Mock contacted a man who identified himself as Mike Akroush.  (*Id.* at ¶ 65.)  Defendant Akroush gave his name, date of birth, and a phone number, and stated

---

[4]  Affirmative misrepresentations in a search warrant affidavit are material if probable cause is lacking absent consideration of the misrepresented facts.  *Crowe v. County of San Diego*, 608 F.3d 406, 435 (9th Cir. 2010) (citing *Franks*, 438 U.S. at 171–72).  A misrepresentation based on an omission is material where the inclusion of the omitted facts would "cast doubt on the existence of probable cause."  *Id.* (quoting *United States v. Garza*, 980 F.2d 546, 551 (9th Cir. 1992)).

that his address was 4030 Niles Street, Bakersfield, CA—the same address listed on the Magic Man's website. (*Id.*) Akroush also informed Mock that he sent the box, that its contents were legal tobacco products, and that he had lab reports attesting to the identity of the substances. (*Id.*) On December 14, 2012, Mock and another DPD investigator, David Saxon, contacted Vimalkamar Patel. (*Id.* at ¶ 67.) Patel stated that he was the owner of Woodhams Convenience Center and that he was expecting the package from UPS. (*Id.*) After being shown the receipts and invoices from the package, Patel confirmed that this was the package he was expecting. (*Id.*) Patel went on to state that he had purchased approximately $10,000.00 of SSC products from the Magic Man's website. (*Id.*)

On November 6, 2013, Saxon conducted a traffic/enforcement stop of Patel and executed search warrants at Patel's residence and at Woodhams Convenience Center. (*Id.* at ¶ 68.) The traffic stop resulted in the seizure of 38 packages of SSC products, containing 883.4 grams of XLR11 and AB-FUBINACA.[5] (*Id.*) Officers also seized $10,766.00 in cash. (*Id.*) During the search of Patel's residence, Saxon located several large bags containing packages of SSC products similar to those found in Patel's vehicle. (*Id.*) During the search of the Woodhams Convenience Center, Saxon located a laptop in the corner of the office. (*Id.* at ¶ 69.) Patel's wife, who was present, consented to a search of the laptop. (*Id.*) After unlocking it, the laptop screen displayed the Magic Man's website, which listed items similar to the SSC products seized as a result of the searches of Patel's vehicle and residence. (*Id.*) Saxon also located two invoices from Magic Man's. (*Id.*)

Both search warrant affidavits state that Magic Man's was eventually discontinued, but that in December 2013, a new website, www.bluewhalestore.com ("Blue Whale") was created, and that defendants Farraj and Akroush continued to offer SSC products for sale through the Blue Whale website. (*Id.* at ¶ 58; Exh. B-1 at ¶ 15.) On August 18, 2014, the affiants met with a DEA confidential source (CS) identified as a customer of Blue Whale. (Exh. A-1 at ¶ 74; Exh. B-1 at

---

[5] The search warrant affidavits stated that XLR11 and AB-FUBINACA were Schedule I controlled substances as of the date of this seizure, November 6, 2013. However, the government now concedes that this statement was false: although XLR11 was a Schedule I controlled substance as of that date, AB-FUBINACA was not.

¶ 25.)  The CS was working with the DEA Bakersfield Resident Office and described the process of ordering from Blue Whale as follows.  (Exh. A-1 at ¶ 74; Exh. B-1 at ¶ 25.)  On day one, the CS would deposit funds into a Bank of America account associated with Farraj.  (Exh. A-1 at ¶ 76; Exh. B-1 at ¶ 27.)  On day two, the CS would call Blue Whale, a representative would verify the funds, and the CS would place the order.  (Exh. A-1 at ¶ 76; Exh. B-1 at ¶ 27.)  On day three, the product would be delivered by UPS.  (Exh. A-1 at ¶ 76; Exh. B-1 at ¶ 27.)  According to the CS, that procedure had recently changed:  whereas the funds were previously deposited into Farraj's Bank of America account, they were now to be deposited into a Bank of America account associated with defendant Akroush.  (Exh. A-1 at ¶ 77; Exh. B-1 at ¶ 28.)

Both affidavits allege that on August 26, 2014, agents provided the CS with $1,790.00 to conduct a controlled purchase from Blue Whale.  (Exh. A-1 at ¶ 80; Exh. B-1 at ¶ 29.)  The money was then transferred into defendant Akroush's account at Bank of America.  (Exh. A-1 at ¶ 80; Exh. B-1 at ¶ 29.)  On August 27, 2014, the CS placed a phone call to Blue Whale and spoke with an unidentified female employee, placing an order for fifteen 10-gram bags of SSC products known as OMG, as well as various 10-gram bags of Bizarro strawberry and blueberry. (Exh. A-1 at ¶ 81; Exh. B-1 at ¶ 30.)  The money for that transaction was transferred into Akroush's account.  (Exh. A-1 at ¶ 81; Exh. B-1 at ¶ 30.)  That same day, surveillance agents observed a UPS truck arrive at 8501 Kern Canyon Road, Bakersfield, CA (the original physical location of Blue Whale).  (Exh. A-1 at ¶ 82; Exh. B-1 at ¶ 31.)  Moments later, the UPS driver exited the store carrying two boxes wrapped in white and blue tape.  (Exh. A-1 at ¶ 82; Exh. B-1 at ¶ 31.)  On August 28, 2014, agents seized an unopened UPS package delivered to the CS's residence containing OMG, Bizarro strawberry, and Bizarro blueberry.  (Exh. A-1 at ¶ 83; Exh. B-1 at ¶ 32.)  A short time thereafter, the CS made a controlled, recorded phone call to Blue Whale.  (Exh. A-1 at ¶ 83; Exh. B-1 at ¶ 32.)  The CS stated that the shipment he received was short by about five packages of Bizarro, and asked whether Farraj or Akroush were available to discuss the situation.  (Exh. A-1 at ¶ 83; Exh. B-1 at ¶ 32.)  The employee who answered, later identified as Varina Gonzalez, stated that her boss was not available.  (Exh. A-1 at ¶ 83; Exh. B-1 at ¶ 32.)  The CS asked whether Farraj was her boss, to which Gonzalez responded in the

affirmative.  (Exh. A-1 at ¶ 83; Exh. B-1 at ¶ 32.)  A subsequent analysis of the packages

confirmed that they contained XLR11 and AB-PINACA.  (Exh. A-1 at ¶ 84; Exh. B-1 at ¶ 32.)

At that time, XLR11 was a Schedule I controlled substance, having been so classified as of May

16, 2013.

In his affidavit in support of SW-289 Task Force Officer Merritt stated that on August 20,

2014, the Franklin County (Pennsylvania) Drug Task Force (FCDTF) had executed a search

warrant at the residence of Daniel Naugle, an alleged SSC distributor for Charles Lynch.  (Exh.

A-1 at ¶ 85.)  Upon arrival, members of the FCDTF located Naugle in the front of his residence

and took him into custody.  (*Id.* at ¶ 86.)  Naugle informed Detective Taylor that he was in

possession of SSC products that were in a backpack in the apartment.  (*Id.*)  Naugle also informed

Taylor about various amounts of U.S. currency inside the residence.  (*Id.*)  Upon advice and

waiver of his *Miranda* rights, Naugle admitted to selling and distributing SSC products.  (*Id.*)  A

search of Naugle's bedroom resulted in the discovery of 10-gram bags of Bizarro.  (*Id.*)

Affiant Merritt also reported as follows.  On the same day as the contact with Naugle, the

FCDTF executed a search warrant at Lynch's residence located at 12111 Pen Mar Road,

Waynesboro, Pennsylvania.  (*Id.* at ¶ 87.)  Lynch was a large-scale SSC distributor in

Pennsylvania who used Farraj and Akroush as a source of supply.  (*Id.*)  Upon entering Lynch's

residence, agents read him and his girlfriend, Susan Hollabaugh, their *Miranda* rights and

proceeded to search the residence.  (*Id.* at ¶ 88.)  Therein, agents located ten 10-gram bags of

Bizarro hidden in the basement, as well as cardboard boxes in Lynch's bedroom used by Blue

Whale to ship SSCs to Lynch.  (*Id.*)  Agents also recovered an LG cellular telephone from a

nightstand in Lynch's bedroom and Lynch stated that he used that specific phone to order SSC

products from Blue Whale.  (*Id.*)  Lynch identified Farraj as his source for SSCs.  (*Id.* at ¶ 89.)

Lynch also provided details about the manner in which he would order SSCs from Farraj.  (*Id.* at

¶¶ 89–93.)  Lynch stated that he had originally ordered SSCs from the website

www.magicmanswholesale.com, but after that website was shut down, Farraj advised him to

order from www.bluewhalestore.com instead.  (*Id.* at ¶ 93.)

/////

The affidavit in support of SW-289 also stated that on October 20, 2014, DEA Special Agent Olson was conducting surveillance of 8501 Kern Canyon Road, Bakersfield, CA, Blue Whale's physical location. (*Id.* at ¶ 94.) Agent Olson observed Farraj and Akroush removing items from 8501 Kern Canyon Road, including large brown boxes and furniture, and loading items into defendant Akroush's white Mazda van and a 2006 white Toyota Tundra truck. (*Id.*) Agent Olson observed both vehicles leaving the area a short time later. (*Id.*) Both vehicles parked in front of 904 Niles Street, Bakersfield, CA, and Agent Olson then observed Farraj and Akroush removing items from the vehicles and bringing the items inside. (*Id.* at ¶ 95.) A subsequent records search indicated that 904 Niles Street was the new physical location of Blue Whale. (*Id.* at ¶ 58.)

Task Force Officer Merritt's affidavit in support of SW-289 stated that on February 5, 2015, agents conducted surveillance on Farraj. (*Id.* at ¶ 96.) DEA Special Agent Olson was monitoring a GPS tracking device previously installed on Farraj's vehicle, which revealed the vehicle to be at Payless Mini Storage, located at 3601 Auburn Street, Bakersfield, CA. (*Id.*) A short time later, Farraj's vehicle was observed parked at 904 Niles Street. (*Id.* at ¶ 97.) Farraj exited the building and drove to a U.S. Postal Office located at 1436 Crestmont Drive in Bakersfield. (*Id.*) He then drove to A to Z Auto Sales, located at 4030 Niles Street, Bakersfield, CA, at which time he was observed meeting with defendant Akroush. (*Id.*) Akroush was observed holding/carrying a white plastic bag containing unknown items. (*Id.*) Farraj and Akroush walked out of view behind a building before eventually reappearing, with Farraj now holding the white bag. (*Id.*)

Eventually, Farraj entered his vehicle and drove back to Payless Mini Storage. (*Id.* at ¶ 98.) Agents observed Farraj driving the vehicle inside the storage unit lot. (*Id.*) A short time later, Farraj left Payless Mini Storage and arrived at 904 Niles Street, at which time he was observed exiting his vehicle, retrieving the white bag from the right front seat, and entering the building at 904 Niles Street. (*Id.*)

On March 2, 2015, Agent Olson, using the alias David Wilson, accessed the Blue Whale website and placed an order for ten 10-gram packages of Bizarro Strawberry, five 10-gram

packages of Bizarro Cherry, and five 10-gram packages of OMG.  (*Id.* at ¶ 99.)  A short time

thereafter, Olson received an email from Blue Whale, confirming the order in the amount of

$908.00.  (*Id.*)  Olson then placed a controlled, recorded telephone call to Blue Whale and spoke

with a female employee, later identified as Ariel Gomez.  (*Id.* at ¶ 100.)  During the call, Olson

changed his order and quantity of products and agreed to "express shipping."  (*Id.*)  Gomez asked

Olson which bank account he intended to make a deposit into, and provided Olson with a Bank of

America account and a Wells Fargo account, both associated with defendant Akroush.  (*Id.*)

A short time later, Bakersfield Police Department (BPD) detectives established

surveillance at 904 Niles Street.  (*Id.* at ¶ 101.)  Thereafter, Agent Olson and affiant Merritt

deposited money into the Bank of America bank account associated with defendant Akroush.

(*Id.*)  Olson and the affiant then arrived at 904 Niles Street to monitor Blue Whale.  (*Id.* at ¶ 102.)

A blue 1995 Buick LeSabre, previously identified as being registered to and utilized by Blue

Whale Store employee Gomez, was parked directly in front of 904 Niles Street.  (*Id.*)  Also

parked there was a red Volkswagen Jetta, which had previously been identified as registered to

and utilized by Blue Whale Store employee Gonzalez.  (*Id.*)  Gomez was then observed exiting

the front door of 904 Niles Street, entering the driver's side of the vehicle, placing several

packages into the right front passenger seat, and leaving the area.  (*Id.* at ¶ 103.)  Surveillance

agents followed Gomez to the U.S. Postal Office at 1436 Crestmont Drive.  (*Id.*)

Gomez was subsequently seen exiting the Buick and entering the Post Office carrying

several packages.  (*Id.* at ¶ 104.)  Agent Olson and Officer Merritt met with USPS Inspector

Trevor Covert and entered the Post Office, whereupon they observed Gomez completing several

transactions at the counter.  (*Id.*)  One of the packages was a white cardboard box addressed to

David Wilson, P.O. Box 1718, Bishop, California, 93515, the address provided by Agent Olson

when placing the order.  (*Id.*)  The return information on the package stated that the package was

shipped from World Inc., 904 Niles Street, Bakersfield, CA.[6]  (*Id.*)  Agent Olson took custody of

the package addressed to David Wilson and found it to contain packages labeled Bizarro

---

[6]  World Inc. refers to World of Incense, as explained below in greater detail.

Blueberry, Bizarro Strawberry, Bizarro Cherry, and OMG. (*Id.* at ¶ 106.) Testing of these packages later determined that they contained AB-PINACA and AB-CHMINACA, which were Schedule I controlled substances at the time of their seizure. (*Id.* at ¶ 107.)

On December 11, 2014, DEA Agents Olson and Covert went to the USPS Crestmont Post Office located at 1436 Crestmont Drive to identify parcels containing SSC products shipped by the Blue Whale Store from its location at 904 Niles Street. (*Id.* at ¶ 108.) A Post Office employee identified parcels which had been dropped off by Farraj, including several displaying a return address of 906 Niles Street.[7] (*Id.*) The packages reflected that they were shipped from "World Inc." and "BWS," with the latter believed to be an abbreviation for Blue Whale Stores. (*Id.*) Agent Covert's review of surveillance video from the Post Office identified Farraj as the mailer of these packages. (*Id.*) Pursuant to a search warrant issued by U.S. Magistrate Judge Jennifer L. Thurston, one of these parcels was opened and found to contain packages of Bizarro and Orgazmo. (*Id.* at ¶ 109.) Later testing revealed those SSC products to contain AB-PINACA and XLR11, the latter of which was a Schedule I controlled substance at the time of seizure. (*Id.* at ¶ 110.)

The affiants for both warrants stated that a review of bank records showed that, from 2012 to 2015, defendants Akroush and Farraj received more than $3 million in deposits into their bank accounts. (*Id.* at ¶ 146; Exh. B-1 at ¶ 19.) Bank records and surveillance revealed that the deposits were generally in small-dollar amounts, typically under $10,000.00. (Exh. A-1 at ¶ 147; Exh. B-1 at ¶ 20.) In addition, both search warrant affidavits stated that withdrawals from those accounts were made in denominations of $10,000 or less, "in a manner consistent with attempting to prevent banks from filing [Currency Transaction Reports] (CTRs) on those transactions." (Exh. A-1 at ¶ 147; Exh. B-1 at ¶ 20.)

Both affidavits also detailed several incidents relevant to a determination of probable cause to believe that unlawful structuring of financial transactions had occurred. On October 17,

---

[7] As indicated above, record searches indicated that the physical location of Blue Whale was 904 Niles Street. (*Id.* at ¶ 58.) The affiant opined that use of 906 Niles Street, rather than 904 Niles Street, "was an intentional means of concealing the origins of the package." (*Id.* at ¶ 108 n.8.)

2014, IRS Special Agent Torres, Agent Olson, and Officer Merritt conducted interviews with the branch manager, service manager, and a teller at Wells Fargo Bank, located at 3743 Columbus Street, Bakersfield, CA 93306. (Exh. A-1 at ¶ 148; Exh. B-1 at ¶ 21.) The service manager and teller identified defendant Akroush from a photo and stated that he had been coming to the branch for approximately two years. (Exh. A-1 at ¶ 148; Exh. B-1 at ¶ 21.) They also stated that Akroush, who had told bank employees to refer to him by his nickname "Magic," had a business identified as Magic Man's Wholesale. (Exh. A-1 at ¶ 148; Exh. B-1 at ¶ 21.) The teller stated that defendant Akroush reportedly sold his business because it was illegal to sell specific products but the teller did not know what products he was selling. (Exh. A-1 at ¶ 148; Exh. B-1 at ¶ 21.) The service manager and teller also told agents that defendant Akroush would make cash withdrawals up to $10,000.00, and they believed that Akroush knew about CTRs and the bank's filing requirements. (Exh. A-1 at ¶ 149; Exh. B-1 at ¶ 22.)

Both search warrant affidavits reported that on January 6, 2015, IRS Special Agent Torres received a phone call from the branch manager at the Wells Fargo location regarding an interaction with and a transaction conducted by defendant Akroush. (Exh. A-1 at ¶ 150; Exh. B-1 at ¶ 23.) The branch manager and service manager stated that on the previous day, Akroush visited the branch and wanted to cash two separate checks, one for $9,000.00 and another for $8,000.00. (Exh. A-1 at ¶ 150; Exh. B-1 at ¶ 23.) Because both checks were being cashed, he was advised that a CTR would be filed. (Exh. A-1 at ¶ 150; Exh. B-1 at ¶ 23.) Defendant Akroush reportedly became upset and ultimately decided to only cash the $9,000.000 check in order to avoid the issuance of a CTR. (Exh. A-1 at ¶ 150; Exh. B-1 at ¶ 23.)

Both affidavits also state that on June 25, 2015, IRS Agent Torres received another phone call from the service manager and a banker at the same Wells Fargo location regarding an interaction with defendant Akroush. (Exh. A-1 at ¶ 151; Exh. B-1 at ¶ 24.) The banker stated that Akroush approached his desk and questioned him about how to get around the filing of a CTR. (Exh. A-1 at ¶ 151; Exh. B-1 at ¶ 24.) Specifically, defendant Akroush asked whether a CTR would be filed if he were to deposit $9,000.00 into bank accounts for each of his three children. (Exh. A-1 at ¶ 151; Exh. B-1 at ¶ 24.) The banker reported that he told Akroush that

such a deposit would trigger the filing of a CTR because the total deposit amount would be in excess of $10,000.00. (Exh. A-1 at ¶ 151; Exh. B-1 at ¶ 24.) Akroush then asked whether a CTR would be filed if he brought his children into the branch and let each of them make the deposit. (Exh. A-1 at ¶ 151; Exh. B-1 at ¶ 24.) The banker told Akroush that a report most likely would not be filed under those circumstances. (Exh. A-1 at ¶ 151; Exh. B-1 at ¶ 24.)

In moving to suppress evidence seized defendant Akroush identifies numerous alleged misstatements in or omissions from the search warrant affidavits that, in his view, necessitate the granting of a *Franks* hearing. Of these, the government concedes that one of the statements made by affiant Merritt in support of the issuance of SW-289 was false. Specifically, in that affidavit affiant Merritt falsely stated that XLR11 and AB-FUBINACA were Schedule I controlled substances as of November 6, 2013. (Doc. No. 346 at 16.) In truth and as the government now concedes, as of that date, AB-FUBINACA was not a Schedule I controlled substance.[8] Below, the court will address defendant Akroush's other contentions regarding false statements in and material omissions from the search warrant affidavits.

1.      False Statements and Omissions

a.      *Seizure on November 9, 2012*

Officer Merritt omitted from his affidavit in support of SW-289 the eventual test results of the SSCs found in the packages seized on November 9, 2012. (Doc. No. 346 at 15.) Although the affiant never stated that those products contained controlled substances, a reader could have plausibly inferred that to be the representation being made. That affidavit also failed to report that weeks after the November 9, 2012 seizure, defendant Akroush called the DPD and spoke with Mock, asked the DPD to test his products if they believed them to be illegal, and was told to call back in a couple weeks when the police report was finished. (*Id.*) The affidavit further failed to state that Akroush called Mock back once again, but was told that it would be several months

---

[8] Although the statement in the affidavit was admittedly untrue, the government contends that at that time AB-FUBINACA could be treated as a controlled substance analogue to the extent intended for human consumption. This suggestion, however, is misguided in that neither affidavit even mentions controlled substance analogues nor do they attempt to establish probable cause to believe that evidence of a Controlled Substance Analogue Act violation would be found at the locations to be searched.

before his product could be tested.  (*Id.*)  Finally, the affidavit did not state that defendant Akroush was ever provided a copy of the police report or informed of the laboratory results of the products seized on November 9, 2012.  (*Id.* at 16.)

           b.     *Seizure on November 6, 2013*

In his affidavit for SW-289, Officer Merritt stated that SSCs were shipped to Patel and seized from his vehicle on November 6, 2013 in Dothan, Alabama.  (Exh. A-1 at ¶ 68.)  The affidavit also provided that during a search of Patel's residence that same day, investigators discovered two boxes in a closet containing packages of SSCs, which were similar to those found in Patel's vehicle.  (*Id.*)  The SSCs seized from Patel's car contained AB-FUBINACA and XLR11, the latter of which was a Schedule I controlled substance at the time of the November 6, 2013 seizure.  However, the affidavit failed to mention that the shipping labels from the boxes found in Patel's residence reflected that those boxes were not shipped from defendant Akroush's address in Bakersfield.  Instead, the labels indicated those boxes were sent from 5128 West 138th Street, Hawthorne, California, and were shipped from a Mike Deeb, which law enforcement believed was an alias used by defendant Habash.  (*Id.*)

           c.     *Seizure on June 13, 2014*

Next, defendant Akroush takes issue with omissions from the search warrant affidavits in relation to a seizure of a parcel in Louisville, Kentucky on June 13, 2014.  On that date, U.S. Postal Inspector Kristi Parkerson seized a parcel with a return address for Blue Whale.  (Exh. H-1.)  The parcel contained five 10-gram package which, according to the government's laboratory analysis, contained SSCs.  (Exh. H-2, H-3.)  Neither affidavit discussed the results of the government's laboratory test regarding the contents of this seized package.  As the government's test revealed, the one 10-gram package within parcel contained XLR11, a Schedule I controlled substance at that time.  (Exh. H-3.)  The remaining packages, however, did not contain Schedule I controlled substances.  (Exh. H-2, H-3.)

           d.     *Seizure on August 20, 2014*

Defendant Akroush next complains of omissions from the search warrant affidavits related to the seizures conducted in Franklin County, Pennsylvania on August 20, 2014.  That day, the

Pennsylvania Drug Task Force executed search warrants at the residences of Daniel Naugle and Charles Lynch. (Exh. A-1 at ¶¶ 84, 87.) Both affidavits omit reporting that the products seized from those locations on that date tested negative for any Schedule I controlled substances. (Exh. I-1, I-2, I-3.)

> e. *Confidential Source Purchase on August 27, 2014*

Next, defendant Akroush argues that the search warrant affidavits omitted material facts related to purchases conducted by the DEA confidential source (CS) and referred to elsewhere in those affidavits. The CS purchased products from the Blue Whale website which, according to Akroush, the government subsequently tested. However, those tests results were not reported in the search warrant affidavits. The seized Bizarro blueberry and OMG packages did test positive for XLR11, a Schedule I controlled substance. (Exh. J-1, J-2, J-3.) However, the Bizarro strawberry packages tested negative for XLR11 or for any other Schedule I controlled substance. (Exh. J-3.)

> f. *Seizure on October 3, 2014*

Next, defendant Akroush argues that material facts were omitted from the affidavits with respect to a seizure that took place on October 3, 2014 in Louisville, Kentucky. On that date, U.S. Postal Inspector Clint Springer seized a package bearing the return address for the Blue Whale Store. (Exh. K-1, K-2, and K-3.) The package contained suspected synthetic cannabinoids. (Exh. K-1.) However, the affidavits omit reference to the fact that subsequent testing revealed that the package did not contain any substances that were classified as Schedule I controlled substances at the time of seizure. (Exh. K-2, K-3.)

> g. *Seizure on November 25, 2014*

The defense next points out that both search warrant affidavits omit discussion of a search executed by U.S. Postal Inspector Springer on November 25, 2014 in Louisville, Kentucky. In that instance Inspector Springer searched a package containing three 15-gram packages labeled I-Blown with a Blue Whale Store return address. (Exh. L-1, L-2, L-3.) Subsequent testing revealed that the package did not contain any substances classified as Schedule I controlled substances at the time of seizure but this was not reported in the affidavits. (*Id.*)

19

h.     *Seizure on December 11, 2014*

Officer Merritt's affidavit in support of SW-289 reported that U.S. Postal Inspector Trevor Covert went to the Post Office at 1436 Crestmont Drive in Bakersfield and seized a parcel containing one 10-gram package of Bizarro and one 10-gram package of Orgazmo which was sent by defendant Farraj. (Exh. A-1 at ¶ 109, M-2, M-3.) The affidavit also affirmatively states that "the packages contained 7.4 grams of XLR-11 and AB-PINACA." (*Id.*) As defendant Akroush points out, however, the affiant failed to also report that the Orgazmo, though not the Bizarro, tested negative for the presence of a Schedule I controlled substance. (Doc. No. 346 at 21.)

i.     *Information Related to S.N.*

Next, defendant Akroush contends that both search warrant affidavits omits a great deal of information regarding an informant referred to as S.N.[9] Akroush contends that omitted from the affidavits was information that: (1) S.N. manufactured SSCs; (2) S.N. was a government cooperator; (3) S.N. was on probation with a 7 year stayed prison sentence while manufacturing SSCs; (4) S.N. was the subject of both a state and federal search warrant while on probation, as a result of which law enforcement discovered S.N. to be manufacturing SSCs; (5) during execution of the state search warrant, law enforcement found a handgun and AK-47; (6) S.N. admitted to possessing a firearm and was cooperating with law enforcement to avoid being charged as a result of evidence discovered in that search; and (7) S.N. informed law enforcement that he would continue to manufacture SSC products, wanted to purchase another SSC business, and believed SSCs were legal in California. (Doc. No. 346 at 41 (citing various exhibits).)

j.     *Evidence Regarding Income Reporting*

Defendant Akroush also takes issue with Officer Merritt's affidavit in support of SW-289 because it omits facts showing that Akroush believed his conduct was consistent with a legal

---

[9] "When a defendant challenges the validity of a warrant by questioning the reliability of a confidential informant, the proper procedure, followed here, is for the trial court to conduct an *ex parte*, *in camera* hearing to determine whether the defendant has made a threshold substantial showing of falsehood." *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000) (internal quotation marks omitted).

income-producing business. Specifically, he argues that the affidavit omitted the fact that Akroush's income from Magic Man's and Blue Whale was reported on his income tax returns, as well as that the gross receipts from the sale of SSC products by both entities were also reported on his tax returns. (Exh. S.)

k.    *Evidence Regarding Structuring*

Finally, defendant Akroush argues that both search warrant affidavits omitted material facts relevant specifically to the determination of whether probable cause existed to believe that unlawful structuring of financial transactions had occurred. As noted above, the search warrant affidavits reported that Akroush sought to cash two checks with his bank on January 6, 2015 that totaled $17,000.00. (Exh. A-1 at ¶ 150; Exh. B-1 at ¶ 23.) However, defendant Akroush argues that the affidavits failed to inform the reader that the checks he sought to cash on January 6, 2015 were not related to Akroush's SSC business. Instead, Akroush contends that these checks were for the funeral of his nephew, who had recently passed away. (*See* Exh. T.) In this regard, he notes that the checks in question were written by Henry and Khetem Bakhit, members of Akroush's family. (*Id.*)

2.    Whether The Affidavits Established Probable Cause When The Accurate and Additional Information is Considered

As recognized above, defendant Akroush's burden in moving for a hearing under *Franks* is two-fold. To be entitled to such an evidentiary hearing, he must make a "'substantial preliminary showing'" that false or misleading statements were (1) deliberately or recklessly included in an affidavit submitted in support of a search warrant; and (2) "'necessary to the finding of probable cause.'" *Flyer*, 633 F.3d at 916 (quoting *Craighead*, 539 F.3d at 1080).

The court will assume for purposes of resolving the pending motion, without deciding, that the alleged false statements and/or omissions were done by the affiants intentionally or recklessly. However, even if defendant Akroush is correct in this regard, corrected affidavits would have established probable cause justifying the issuance of both search warrants, as will be explained below.

/////

The affidavit avers that probable cause exists that evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846, as well as violations of 31 U.S.C. § 6324(a)(1) will be found at the places authorized to be searched.  In support of this conclusion, Task Force Officer Merritt's affidavit contains numerous unchallenged statements connecting defendant Akroush to the various corporations alleged to be trafficking in SSCs.  For instance, Merritt's affidavit stated that according to records, defendant Akroush established the website www.magicmanswholesale.com in January 2011 using the address 4030 Niles Street, Bakersfield, CA.  (Exh. A-1 at ¶ 57.)  In addition, multiple Wells Fargo employees told law enforcement officers that defendant Akroush had a business known as Magic Mans Wholesale, and that Akroush told bank employees to call him by his nickname, "Magic."  (*Id.* at ¶ 148.)  The affidavit also explained that Magic Man's was eventually discontinued, but that in December 2013, a new website, www.bluewhalestore.com, was created, and that defendants Farraj and Akroush continued to offer SSC products for sale through Blue Whale and its website.  (*Id.* at ¶ 58.)  Records searches indicated that Blue Whale Store was associated with two physical addresses:  8501 Kern Canyon Road, Bakersfield, CA, and 904 Niles Street, Bakersfield, CA.  (*Id.*)  Officer Merritt's affidavit stated that during the investigation defendant Akroush was observed at both locations.  For instance, on October 20, 2014, Agent Olson observed defendants Farraj and Akroush transporting large brown boxes and furniture from 8501 Kern Canyon Road to 904 Niles Street.  (*Id.* at ¶¶ 94–95.)  Separately, on February 5, 2015, Olson and affiant Officer Merritt observed Farraj and Akroush at 904 Niles Street.  In addition, on February 26, 2015, Blue Whale employee Gonzalez informed Agent Olson that www.magicmanswholesale.com was the original name of the business and that while the business had been purchased by another owner (presumably Farraj, as indicated by business records), the original owner (presumably Akroush) still owned part of the business and was "kind of like the behind man."  (*Id.* at ¶ 114.)  Moreover, the affidavit related that Blue Whale employees provided a bank account associated with defendant Akroush to Agent Olson as a means to make payment to Blue Whale for SSCs.  (*Id.* at ¶ 100.)  The affidavit also sets forth facts indicating that a third company, World of Incense, was effectively an alter ego of Blue

22

Whale, and was similarly connected to defendant Akroush. Specifically, on March 12, 2015, Agent Olson again spoke to Blue Whale employee Gonzalez and asked if there was another website through which he could place an order. (*Id.* at ¶¶ 119–120.) Gonzalez responded that www.worldofincense.com would have "exactly the same stuff" as www.bluewhalestore.com. (*Id.* at ¶ 120.) These statements set forth in Officer Merritt's affidavit, all of which are uncontested, establish probable cause to believe that defendant Akroush was closely connected with and still had some leadership role in Magic Man's, Blue Whale, and World of Incense well into 2015.

Officer Merritt's search warrant affidavit also sets forth support for a probable cause finding that the companies engaged in the distribution of Schedule I controlled substances. This is most certainly true at the very least with respect to Blue Whale. For instance, the affidavit describes a controlled purchase from Blue Whale on March 2, 2015 (*Id.* at ¶¶ 99–107), with subsequent analysis revealing that the shipment contained both AB-PINACA and AB-CHMINACA, both of which were then Schedule I controlled substances. (*Id.* at ¶ 107.) In addition, a package seized on December 11, 2014 with a return address of "BWS 906 Niles Street, Bakersfield, California 93305" contained XLR11 and AB-PINACA, both Schedule I controlled substances at that time. (*Id.* at ¶¶ at 108, 110.)

As noted above, probable cause means a "fair probability that contraband or evidence of a crime will be found in a particular place, based on the totality of circumstances." *United States v. Diaz*, 491 F.3d 1074, 1078 (9th Cir. 2007). The probable cause standard does not require the court to "believe to an absolute certainty, or by clear and convincing evidence, or even by a preponderance of the available evidence," that evidence of a crime will be found at the particular location to be searched. *See United States v. Lopez*, 482 F.3d 1067, 1078 (9th Cir. 2007). Although the evidence recounted in the Merritt search warrant affidavit is perhaps not overwhelming, the undersigned nonetheless concludes that it is sufficient to establish a fair probability that defendant Akroush was engaged in the distribution of, or the possession with intent to distribute, controlled substances. First, there was surveillance placing defendant Akroush at both physical addresses associated with Blue Whale Store. Not only was he present at these locations, but he (along with defendant Farraj) was observed moving boxes into and out of

these locations at a time when Blue Whale was distributing scheduled controlled substances. Second, and relatedly, the affidavit described a meeting between defendants Farraj and Akroush at A to Z Auto Sales, where defendant Akroush was observed carrying a white plastic bag, the contents of which were not known. Both individuals walked out of view behind a building before eventually reappearing, this time with defendant Farraj holding the white bag. Third, there is the statement of Blue Whale's employee Gonzalez that defendant Akroush remained a part owner of Blue Whale and that he was "kind of like the behind man." Finally, and perhaps most significantly in the court's view, is the fact that bank accounts associated with defendant Akroush were used to process transactions, including controlled substances transactions, by Blue Whale and World of Incense, resulting in the deposit and withdrawal of millions of dollars. Defendant Akroush's desire to argue that the use of his bank accounts by Blue Whale and World of Incense has an innocent explanation is unavailing in the context of his motion to suppress evidence under *Franks*. The focus here is only whether an affidavit, with its inaccuracies and omissions corrected, would have established probable cause justifying the issuance of the search warrants.[10] Because the affidavit set forth facts directly linking Akroush to Blue Whale at its inception and

_____

[10] Specifically, defendant Akroush suggests that he merely "allow[ed] Blue Whale Wholesale . . . to utilize his bank account after Blue Whale's account was closed." (Doc. No. 346 at 8.) Certainly, at trial he could offer an explanation that he was unaware Blue Whale was using his bank account for transactions involving controlled substances. However, putting forward a plausible post hoc justification for his conduct does not, without more, defeat a finding of probable cause. "The test is not whether the conduct under question is consistent with innocent behavior; law enforcement officers do not have to rule out the possibility of innocent behavior." *United States v. Sutton*, 794 F.2d 1415, 1427 (9th Cir. 1986). That millions of dollars passed in and out of Akroush's bank account is consistent with drug trafficking in the absence of alternative sources of this money. *See United States v. Miguel*, 952 F.2d 285, 289 (9th Cir. 1991) ("[E]vidence of sudden or unexplained wealth is admissible in drug conspiracy trials if it creates a reasonable inference that the unexplained wealth came from the drug conspiracy."). Moreover, while Blue Whale's use of defendant Akroush's bank account is probative of criminal activity, this fact is not viewed in isolation. *See Dawson v. City of Seattle*, 435 F.3d 1054, 1062 (9th Cir. 2006) (the question of whether probable cause has been established is "based on the totality of circumstances"). When combined with other evidence set forth in the Merritt affidavit—such as defendant Akroush's moving boxes in and out of Blue Whale, the surreptitious exchange of a bag between Farraj and Akroush, the statement of a Blue Whale employee on February 26, 2015, that Akroush remained a part owner of the business, and the evidence of drug trafficking by Blue Whale—the undersigned concludes that the affidavit established "a probability or substantial chance of criminal activity." *New York v. P.J. Video, Inc.*, 475 U.S. 868, 877–78 (1986).

continuing thereafter well into 2015 and because the affidavit readily established that Blue Whale was distributing Scheduled I controlled substances at that time, the court is satisfied that under the totality of the circumstances probable cause existed for the issuance of SW-289.

The misstatements and omissions pointed out in Akroush's motion do not alter this conclusion. Although Akroush is correct that the affidavit misstated the legal status of certain SSCs at distinct points in time, the incidents related in the Merritt affidavit with respect to sales by Blue Whale accurately described the legal status of the seized substances. Akroush also points to certain omitted facts—such as Akroush's conversations with Det. Mock, or the fact that his income from these companies was reported on his tax returns—that he suggests indicate that he may have believed the distributed products were legal. If Akroush did not know he and/or Blue Whale possessed a controlled substance, and did not know the identity of the substance, that may provide a defense to the charges in this case brought under the Controlled Substances Act. *See McFadden v. United States*, ___ U.S. ___, ___, 135 S. Ct. 2298, 2304 (2015). However, even if such information had been included in the Merritt affidavit, the search warrant would not be deficient. Again, "probable cause means a fair probability that contraband or evidence of a crime will be found in a particular place, based on the totality of circumstances." *Diaz*, 491 F.3d at 1078 (internal quotation marks omitted); *see also Illinois v. Gates*, 462 U.S. 213, 235 (1983) (noting that probable cause is less than "a *prima facie* showing"); *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc) (recognizing that probable cause means "fair probability," not certainty or even a preponderance of the evidence). The probable cause standard does not require that an affidavit in support of a search warrant provide evidence establishing the subject's state of mind—it requires merely evidence demonstrating a likelihood that contraband be present at the place to be searched, not a likelihood that defendant knew it to be contraband. *See United States v. Nazemzadeh*, No. 11-CR-5726-L, 2013 WL 544054, at *12 (S.D. Cal. Feb. 12, 2013) (declining to create a rule "that no search warrant can issue for crimes with a specific intent element unless probable cause supported such intent"); *United States v. Abdallah*, No. CRIM.A. H-07-155, 2007 WL 4334106, at *11 (S.D. Tex. Dec. 7, 2007) ("[Defendants] have not

/////

shown that the affidavit was insufficient to support a finding of probable cause because it failed to

allege specific details on the element of intent.").

The court also finds unpersuasive defendant Akroush's contention that the addition of

certain facts omitted from the affidavits would negate a finding of probable cause as to the

alleged violations of 31 U.S.C. § 5324(a)(1).  As noted, the search warrant affidavits reported that

Akroush sought to cash two checks at his bank on January 6, 2015 that totaled $17,000.00.  (Exh.

A-1 at ¶ 150.)  Upon being told that the cashing of both checks would trigger the filing of a CTR,

Akroush reportedly became upset and eventually decided to cash only the $9,000.00 check.  (*Id.*)

Akroush argues that the affidavit omits the fact that the checks he sought to cash on January 6,

2015, were not related to sales of SSCs.  Instead, Akroush contends that these checks were for the

funeral of his nephew, who had recently passed away.  (*See* Exh. T.)  Again, this contention is

irrelevant to the probable cause determination—what matters is that according to the search

warrant affidavits, Akroush behaved in a manner calculated to avoid the filing of a CTR.  *See* 31

U.S.C. § 5324(a) (noting that a person shall not cause or attempt to cause a domestic financial

institution to fail to file a report "for the purpose of evading the reporting requirements").  Even if

these particular transactions had innocent explanations, the affidavits established probable cause

to believe that defendant Akroush had acted in a manner calculated specifically to avoid

triggering of the CTR filing requirement.

Defendant Akroush's argument that the omitted lab test results on some of the seized

substances negate a finding of probable cause is similarly unavailing.  Akroush is correct that the

affidavits failed to relate the complete test results of many of the SSCs that were seized, and is

also correct that in some instances the SSCs that were seized were not Schedule I controlled

substances at the time of their seizure.  But the argument that this somehow is fatal to the

probable cause showing is misplaced. It is illogical to claim that the shipment of lawful

substances could somehow negate the criminality of distribution of controlled substances.

Distribution of a controlled substance is no less criminal simply because a defendant also happens

to distribute legal products as well.  While the additional seizures highlighted by defendant

Akroush could have been included in the affidavit for the sake of completeness, their inclusion

would not call into question the conclusion that probable cause for the issuance of the warrants was established. In any event, and as the analysis discussed above makes clear, probable cause for the issuance of the warrants is established based upon the nexus between defendant Akroush and Blue Whale and the recitation of evidence that Blue Whale was engaged in trafficking Schedule I controlled substances at the time of Akroush's involvement in the business. *See Perkins*, 850 F.3d at 1119; *United States v. Ruiz*, 758 F.3d 1144, 1148 (9th Cir. 2014) (the court is to purge false statements from the affidavit and add to it omitted information necessary to prevent it from being misleading and then determine if the corrected and supplemented affidavit establishes probable cause); *Stanert*, 762 F.2d at 782. Because an affidavit with the corrections and additions sought by defendant Akroush would still have established probable cause for the issuance of SW-289, defendant's request for a *Franks* hearing as well as his motion to suppress evidence seized pursuant to that search warrant will be denied.

b.      *Probable Cause as to SW-66*

Agent Olson's affidavit was much briefer than Officer Merritt's affidavit in support of the issuance of SW-289. Nonetheless, the court concludes that that affidavit establishes probable cause to believe that a violation of 21 U.S.C. §§ 841 and 846 occurred, because of which the Subject Vehicle was subject to seizure pursuant to 18 U.S.C. § 981(b) and 21 U.S.C. § 853(f), and subject to forfeiture pursuant to 21 U.S.C. § 853(a). Agent Olson's affidavit stated that Akroush and Farraj created Blue Whale and World of Incense, through which they offered SSCs for sale. (*Id.* at ¶ 15.) It also stated that a controlled purchase of SSCs occurred from August 26 until August 28, 2014, resulting in the distribution by Blue Whale of 615.1 grams of XLR11 and AB-PINACA, which were both Schedule I controlled substances at that time. (*Id.* at ¶¶ 29–32.) It next stated that defendant Akroush had bank accounts with Wells Fargo and Bank of America with total deposits over $3.5 million, and from which Akroush withdrew more than $2.5 million. (*Id.* at ¶ 19.) Notably, these withdrawals were made in denominations of $10,000.00 or less, in a manner consistent with one attempting to prevent banks from filing CTRs. (*Id.* at ¶ 20.) The affidavit also detailed incidents on January 6, 2015 and June 25, 2015 where defendant Akroush sought to cash or deposit multiple checks, each just slightly below the $10,000.00 reporting

threshold.  (*Id.* at ¶¶ 23–24.)  In one such instance described by affiant Olson, defendant Akroush asked multiple questions of bank employees about the circumstances under which a CTR would be filed.  (*Id.* at ¶ 24.)  The warrant affidavit then reported that officers interviewed defendant Akroush's wife, who told the officers that she made approximately $2,000.00 per month, that this money was used to pay household expenses and she did not know how much Akroush earns or about his businesses.  (*Id.* at 34.)  Finally, the affidavit stated that the Subject Vehicle was purchased via a $30,000.00 wire transfer from a Wells Fargo bank account into which defendant Akroush had made multiple cash deposits.  (*Id.* at ¶¶ 41–42.)  Based on the affiant's financial analysis and investigation, the affidavit reported that the cash deposits were derived from structured cash withdrawals and included deposits of $5,000.00, $4,900.00, $6,500.00, $9,900.00, and $9,900.00.  (*Id.* at ¶ 42.)

Upon including such information, the court finds that the corrected search warrant affidavit of Agent Olson, when retested, would establish probable cause justifying the issuance of the warrant authorizing the seizure of defendant Akroush's 1962 Impala vehicle (SW-66).  (Exh. B-1 at ¶ 6.)[11]  Here, a corrected affidavit would establish that Blue Whale was engaged in the distribution of Schedule I controlled substances, Akroush's bank account was used to process at least one of these transactions, millions of dollars ultimately flowed into and out of that bank account, and no explanation was provided as to where that money came from other than from the sale of SSC products, at least some of which were Schedule I controlled substances.  The court concludes that this "aggregate of facts gives rise to more than mere suspicion" that defendant Akroush was engaged in the distribution of controlled substances.  *United States v. Padilla*, 888 F.2d 642, 644 (9th Cir. 1989).  The most reasonable inference to draw from these facts is that the money used to purchase the Subject Vehicle (as well as almost all the other money that moved in

/////

_____

[11]  The facts described above are somewhat similar to those in *United States v. Roth*, 912 F.2d 1131, 1133–34 (9th Cir. 1990).  There, the Ninth Circuit affirmed a finding of probable cause supporting a pre–trial order restraining assets under the Comprehensive Forfeiture Act of 1984, after finding that the appellant was working closely with an alleged drug trafficker managing his financial affairs, the money trail "appear[ed] suspicious," and no credible alternative explanation as to the source of the money presented itself.  *Roth*, 912 F.2d at 1134.

and out of Akroush's account) came from the sale of SSCs, including the distribution of Schedule I controlled substances as described in the affidavit.

Accordingly, defendant Akroush's motion to suppress evidence seized pursuant to this warrant and request for a *Franks* hearing will also be denied.

## C.    **Motion for Discovery**

Finally, and apparently[12] in connection with his motion to suppress evidence, Akroush moves for discovery with respect to S.N., whom Akroush alleges was a government informant. (Doc. No. 366.)

Under Federal Rule of Criminal Procedure 16(a)(1)(E), the government is required to provide a criminal defendant with discovery of materials "which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense." As the Ninth Circuit has stated:

> Rule 16 permits discovery that is relevant to the development of a possible defense. *United States v. Clegg*, 740 F.2d 16, 18 (9th Cir. 1984). To obtain discovery under Rule 16, a defendant must make a *prima facie* showing of materiality. *United States v. Little*, 753 F.2d 1420, 1445 (9th Cir. 1984); *United States v. Cadet*, 727 F.2d 1453, 1468 (9th Cir. 1984). Neither a general description of the information sought nor conclusory allegations of materiality suffice; a defendant must present facts which would tend to show that the Government is in possession of information helpful to the defense. *See Little*, 753 F.2d at 1445; *Cadet*, 727 F.2d at 1466-68.

*United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990); *see also United States v. Muniz-Jaquez*, 718 F.3d 1180, 1183 (9th Cir. 2013); *United States v. Zone*, 403 F.3d 1101, 1107 (9th Cir. 2005). Moreover,

/////

---

[12]  The defense has not been entirely clear whether its discovery motion was made only in connection with its *Franks* motion or was a more general discovery motion made in anticipation of trial. The assigned magistrate judge believed it had been indicated that discovery was for the *Franks* motion only, seeking discovery as to information that the defense claimed should have been included in the search warrant affidavits, and should be heard by the undersigned. However, in the undersigned's view, defendant's briefing indicates that the discovery motion is actually of the more general variety and seeks discovery of Rule 16 and *Brady* material for purposes of preparing for trial. Accordingly, the motion should have been brought before the magistrate judge. *See* Local Rule 302(b)(1).

> [t]he materiality requirement, however, is not a "heavy burden"; rather, evidence "is material as long as there is a strong indication that . . . the evidence will 'play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.'" *United States v. Liquid Sugars, Inc.*, 158 F.R.D. 466, 471 (E.D. Cal. 1994). "[R]equests which are designed to generally cast for impeachment material . . . are not material. Such requests are instead simply speculative inquiries without basis in fact to believe that the information acquired will be significantly helpful." *Id.* at 472.

*United States v. Bergonzi*, 216 F.R.D. 487, 501 (N.D. Cal. 2003); *see also Strickler v. Greene*, 527 U.S. 263, 280 (1999) ("[E]vidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.") Nonetheless, where the government has shown that complying with a defendant's discovery request under Rule 16 would be unduly burdensome, "it is incumbent on the district court to consider the government interests asserted in light of the materiality shown." *Mandel*, 914 F.2d at 1219 (citing *Cadet*, 727 F.2d at 1468). In the absence of the required factual showing from the defense, there is no basis to order discovery. (*Id.*)

Under the holding in *Brady v. Maryland*, 373 U.S. 83, 86 (1963), the prosecution also has an obligation to reveal exculpatory evidence, whether substantive or for impeachment purposes, when such evidence is "material" to the defense and in the possession of the government. Again, evidence is "material" to the defense if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 474 U.S. 667, 681 (1985). While the *Brady* rule is to be interpreted broadly to encourage prosecutors to carry out their duty of production, the rule does not require the prosecution to divulge every possible shred of evidence that could conceivably be of some use to the defendant. *See, e.g.*, *Moore v. Illinois*, 408 U.S. 786, 795 (1972) ("We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case."); *Ferrara v. United States*, 456 F.3d 278, 291 (1st Cir. 2006) ("[D]ue process does not normally require the prosecution either to turn over the whole of its file or to disclose every shred of information that might conceivably affect the defendant's decisionmaking."); *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 823-24 (10th

Cir. 1995).  In this sense, and because there "is no general constitutional right to discovery in a criminal case[,]" *Brady* is not an evidentiary rule that grants broad discovery powers to a defendant.  *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).  Therefore, a defendant's mere allegation that the requested information might be material to the presentation of a defense does not entitle the defense to essentially an unsupervised, unlimited search of the government's files. *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987).

In moving for discovery, defendant Akroush explains that his defense in this case is that "he did not know the SSC products contained Schedule I controlled substances and that the substances were planted by S.N., with the government's knowledge, in order to increase seized proceeds."  (Doc. No. 366 at 5.)  This proffer is not particularly enlightening for purposes of ruling upon the pending motion.  It suggests the possibility of government misconduct, specifically that the government's actions might have induced Akroush to commit the charged offenses or aided and abetted him in committing the offense.  Defendant Akroush states in his motion that as an aspect of his defense, he will seek to prove "that the government, not Akroush, is guilty of distributing controlled substances."  (Doc. No. 366 at 2.)  This, however, clearly does not appear to be a full-fledged assertion of an entrapment defense, which would require the defense to prove that "(1) the defendant was induced to commit the crime by a government agent, and (2) he was not otherwise predisposed to commit the crime."  *United States v. Cortes*, 757 F.3d 850, 858 (9th Cir. 2014).  Moreover, no proffer has been made suggesting that defendant Akroush was induced to commit this crime by a government agent—indeed, it does not appear as though Akroush had any interaction with government agents, including S.N. were he to be fairly characterized as such, at all.  As the court understands it, defendant Akroush's pronouncement amounts simply to a denial as to one of the elements of the offense, namely a contention that Akroush lacked the requisite *mens rea* to commit the crime alleged.  In other words, Akroush's theory is that due to the government's encouragement, S.N. engaged in the distribution of controlled substances even though the recipients of those substances (such as Akroush) had no idea they were receiving illegal drugs.  Defendant Akroush apparently wants to suggest that the
/////

31

government sought to do so because government agencies stood to gain financially from prosecution and eventual forfeiture proceedings against these recipients. (Doc. No. 366 at 4.)

Below, the court will consider whether any of the documents sought by the defense in discovery are potentially material to a cognizable defense.

### 1. Request No. 1: Cooperation Agreement

Defendant Akroush first seeks the cooperation agreements entered into between S.N. and the Los Angeles County Sheriff's Department. (Doc. No. 366 at 11–12.) He argues that any such agreement is material to preparing his defense and exculpatory because (1) it tends to prove S.N. was a government informant cooperating to work off state and potential federal charges; (2) it tends to prove that while S.N. was a government informant, he was manufacturing and distributing SSCs with the government's knowledge; (3) it can be used to lay the foundation for an argument that the government, not defendant Akroush, is responsible for knowingly allowing the distribution of controlled substances; and (4) it can be used to discredit the caliber and reliability of this criminal investigation and attack the credibility of the law enforcement officers involved in it. (*Id.*)

The government concedes that S.N. was an informant for the Los Angeles County Sheriff's Department ("LASD"). (Doc. No. 420 at 2.) However, defendant Akroush's motion does not suggest that anything contained in any cooperation agreement would be relevant at his trial, since the government has affirmatively stated that it does not intend to call S.N. as a witness. (*Id.*) There is also no reason to believe that any cooperation agreement between S.N. and LASD would contain evidence of government encouragement of S.N. engaging in illegal activities. In this regard, defendant Akroush argues only that "DEA was aware that S.N. was distributing SSC products after agreeing to cooperate with ICE, DEA, and LASD." (Doc. No. 366 at 8.) It requires an unreasonable leap of logic to conclude from that claim, if true, that the government somehow condoned or encouraged these activities on S.N.'s part. Indeed, the evidence referred to by defendant Akroush suggests that far from encouraging any illegal activities by S.N., the government was actively seeking to arrest and indict him for that conduct. (Exh. W-2 at ¶ 13.) The notion that law enforcement officers aided and abetted S.N. in the manufacture and

distribution of controlled substances is purely speculative on defendant's part and provides no factual support nor basis for a discovery order requiring government production of the material sought.

The court is also not persuaded that "discredit[ing] the caliber of the investigation, attack[ing] the reliability of the investigation, and sully[ing] the credibility of law enforcement officers" constitute a valid basis to obtain discovery under Rule 16. "Requests which are designed to generally cast for impeachment material, and which are not directly pertinent to particular tests, are not material. Such requests are simply speculative inquiries without basis in fact to believe that the information acquired will be significantly helpful." *United States v. Salyer*, 271 F.R.D. 148, 157 (E.D. Cal. 2010), *opinion adhered to as modified on reconsideration*, No. CR. S-10-0061 LKK (GGH), 2010 WL 3036444 (E.D. Cal. Aug. 2, 2010); *Liquid Sugars, Inc.*, 158 F.R.D. 466, 472 (E.D. Cal. 1994). Here, again, defendant Akroush's discovery motion is based on nothing more than insinuations of government malfeasance without any factual support for those insinuations.

Because defendant Akroush has not made any threshold showing demonstrating the materiality of any cooperation agreement involving S.N. and the LASD to this case, his request for discovery in this regard will be denied.

### 2. Request Nos. 2–4: Assets Seized as Part of Nationwide Operation

Next, defendant Akroush seeks records documenting assets seized, or the appraised value of assets seized (1) as part of Project Synergy Phase I, II, or III; (2) from S.N.; or (3) from any individual or business S.N. provided information about to a government, state, or local law enforcement agency that provided any assistance in Project Synergy Phase I, II, or III. (Doc. No. 366 at 12.) In addition to the arguments already addressed and rejected above, defendant Akroush argues that discovery of these documents is material to his defense because they would: (1) tend to prove that federal, state, and local law enforcement had a monetary interest in allowing S.N. to distribute SSCs to increase the amount of forfeited proceeds; and (2) tend to prove that federal, state, and local law enforcement increased the amount of forfeited proceeds to be shared

/////

by allowing S.N. to manufacture and distribute SSCs. (Doc. No. 366 at 12.) The government opposes this discovery request as overbroad. (Doc. No. 420 at 2–3.)

As already noted, however, a defendant does not demonstrate materiality simply by asserting that the items sought could conceivably be used for impeachment purposes. *See Salyer*, 271 F.R.D. at 157. Defendant Akroush's motion suggests an alternative justification for discovery of this material, namely that the government (rather than Akroush) is responsible for the distribution of SSCs. As stated, this conclusory assertion is unsupported by presentation of any facts supporting it. This bare assertion therefore does not satisfy the materiality standard. *See United States v. Santiago*, 46 F.3d 885, 895 (9th Cir. 1995). If anything, it appears law enforcement officers sought to stop S.N. from distributing SSCs rather than encouraging him to do so. Even if the requested discovery could conceivably be relevant to a cognizable defense— and the court is very skeptical of this proposition given the attenuated or non-existent relationship between S.N. and defendant Akroush—Akroush has failed to point to any facts indicating that government officials were complicit in S.N.'s alleged illegal activity. Because he has failed to make any showing that such information would be helpful to his defense, the court will deny defendant Akroush's request for discovery of these documents.

3.   Request Nos. 5–7: Equitable Sharing Agreements

Next, defendant Akroush seeks discovery of Equitable Sharing Agreement and Certification ("ESAC") forms and accompanying affidavits submitted for the benefit of federal, state, and local law enforcement agencies related to assets seized from S.N., from any person or business S.N. provided information about to federal, state, or local law enforcement, or as part of an investigation related to Project Synergy Phase I, II, or III. (Doc. No. 366 at 13.) Generally speaking, defendant Akroush posits the same justifications for this request as those already addressed above, namely that various law enforcement agencies had some sort of financial incentive to permit S.N. to engage in illegal activity. (*Id.*) He seeks to use this information to discredit the investigation and the law enforcement officers involved in it. (*Id.*) The government opposes this request as overbroad. (Doc. No. 420 at 3.)

/////

For the reasons stated above and because the discovery sought is not material to any cognizable defense to the criminal charges brought against defendant Akroush, the motion will be denied in this regard.

4. Request No. 8: Additional Information Relating to Assets Seized as Part of a Nationwide Operation

Finally, defendant Akroush seeks documents "that recognize, reward, acknowledge, or promote any personnel of the government or law enforcement agency . . . for assets seized as part of Project Synergy Phase I, II, or III." (Doc. No. 366 at 13–14.) The government opposes discovery of this material, arguing that it is "premised on the highly inaccurate and inflammatory allegation that the government allowed S.N. to manufacture and distribute controlled substances." (Doc. No. 420 at 3.)

As already discussed, Akroush's discovery requests in this regard are premised on the fanciful notion, unsupported by any evidence, that the government encouraged S.N. to distribute controlled substances, which in turn somehow ensnared Akroush because S.N. distributed SSCs that Akroush later obtained. In support of his contention that the government somehow bears responsibility for the crimes alleged against him in the superseding indictment, defendant Akroush argues that "[t]he government offers no evidence that S.N. was directed to stay away from drug related activities." (Id. at 5.) This contention by the defense turns the relevant legal standard on its head. It is not the government's burden to affirmatively disprove materiality under Rule 16. Rather, it is defendant's burden to put forward sufficient facts indicating that the government is in possession of information material to the defense. Defendant Akroush has not proffered any evidence that law enforcement agents encouraged S.N. to engage in criminal activity. Even if he could, such encouragement would be relevant to Akroush's defense only if he could state facts establishing some nexus between that encouragement and his own state of mind.[13] No such facts have been proffered by defendant Akroush. As it stands, it simply appears

---

[13] An example might be, for instance, proffered evidence that Akroush obtained SSCs from S.N. and S.N. took steps to mislead defendant Akroush about the true nature of those substances S.N. was selling to him.

that S.N. was distributing controlled substances and that some law enforcement officers were aware of his actions. There is no evidence before the court that any law enforcement officers encouraged illegal behavior nor is there any proffer that defendant Akroush was misled as to the nature of products that came from S.N., if any.

For these reasons, defendant Akroush's motion for discovery will be denied in its entirety.

## CONCLUSION

For the reasons set forth above,

1.    Defendant's motion to dismiss (Doc. No. 332) is denied;

2.    Defendant's request for a bill of particulars is granted in part, as set forth above;

3.    No later than twenty-one days from the date of service of this order, the government is ordered to provide defendant with a bill of particulars which delineates which alleged seizures or shipments are part of the conspiracies alleged in counts 1 and 2 of the superseding indictment;

4.    Defendant's motion to suppress and request for a *Franks* hearing (Doc. No. 338) is denied; and

5.    Defendant's motion for discovery (Doc. No. 366) is denied.

IT IS SO ORDERED.

Dated:  __**June 5, 2019**__                   _____

                                           UNITED STATES DISTRICT JUDGE